Court of Appeals. This morning, we have four interesting cases. The first one, we have a number of lawyers arguing this criminal case. Let's see. Mr. Heroy. Now mispronounce your name. Heroy. Okay. Be pleased to hear from you, sir. Good morning, and may it please the court. My name is Rob Heroy. I represent Defendant Jorge Sosa in this group. I'd like to address- Mr. Charlotte. Yes, sir. Yes, sir. I'd like to start off by addressing the purpose element of VICAR as it relates to my client, and then time permitting, get into issues of the jury instructions as well as the accumulative nature of the prejudice. Regarding the purpose element, no circuit court in this country has upheld a VICAR conviction where there's been so little evidence as to the purpose element. There have been a number of cases throughout the country where there's been substantially more evidence of purpose where the principle cases that come up are U.S. v. Thai. In that case, there was a bombing by some gang members, two separate clubs. The court held that even though the gang leader had brought some other gang members with him to bomb those clubs, that there was not sufficient evidence that this was a gang purpose as opposed to the gang leader just wanting to get paid from the people that aspiring mobster who was in one group. He had a personal grudge against some other mobsters. He came up and killed two of them in a card game. And part of the reason that he did this is because he wanted to get in with another group and gain entrance to that particular crime family. The court, the Second Circuit, again, held there that there was not enough purpose element to show this was as opposed to whether or not this may be a personal grudge with regard to the two individuals he killed. Ferguson, similar type thing where a gang member was actually paid to commit a murder. The question... What circuit was that? That was also Second Circuit. Seems like most of the good gang cases come out of the Second Circuit. In that case, the question was whether or not he had wanted to commit the murder because he was getting paid for it or whether or not he was advancing his rank in the gang. And the circuit held there simply wasn't evidence to show that he was going to advance within the gang. I think the most convincing case, though, and the case that this court should look to as far as its analysis is actually a district court case out of Connecticut. It involved a personal dispute among a gang leader. I'm forgetting the name of the gang there. It might have been the P.T. Barnum gang, but I could be getting my gangs mixed up here. But anyways, that individual, his girlfriend, he felt had been disrespected by another individual. He goes, he picks up another gang member or two. Immediately after it happens, they go over, they kill the guy at a party. Even though he had brought some other gang members with him and even though he had been disrespected, and maybe that could have reflected badly on the gang, there simply wasn't enough evidence to say this is a personal dispute or this is a gang dispute. And what the court kind of came down to is they said the government's theory leads to no principled basis for distinguishing violence that falls within the ambit of Vicar and violence that's not. So, for example, whether or not something may have come down and violence may have been committed in regard to one's personal feelings as opposed to advancing the interests of the enterprise. And I think this also goes back to you frequently see in these cases reference to the congressional commentary when the Vicar statute came through. And the congressional commentary talks about two things. It talks about how the violence needs to be an integral role within the interests of the enterprise. And also that the states still have an important part to play in prosecuting violent crime. So when we look to the facts of Mr. Sosa's case, what we've got is an individual who there may have been some sort of argument at a nightclub earlier that night that was probably gang related. I'll certainly concede that. But then he leaves that club, he goes with his cousin. There's no evidence whatsoever that his cousin is MS-13. They get into a dispute at a bar. The dispute spills outside. And he comes back and they shoot the individuals or shoot at the individuals who are in the dispute, shoot in their car. Now there's no dispute that this was not a horrendous crime that put human life at risk. I don't think there's any question there. But there's simply no evidence that he went back and bragged to his gang members that he got some sort of advancement in rank or anything like that. In fact, I think you see the opposite. One of the things that happens is after this, the police arrest Mr. Sosa. Word gets back to, I think it's Madrigada was the other individual who was with him, that Mr. Sosa's been arrested. And he actually hears from various people that Mr. Sosa said it wasn't him that committed the shooting, that it was Mr. Madrigada. So Mr. Sosa is actually not even taking credit for the shooting. He's blaming it on the other individual. Does it make any difference that this event occurred in gang territory? I don't think there's any with you. And Your Honor, I would say there's a... I'm not asking you to agree with me. I'm just saying, can you say why it would not matter? It certainly wouldn't matter if it was in gang territory, Your Honor. But there's simply no evidence from the record that it was gang territory. It was an underground liquor house. This wasn't an MS-13 establishment. And I think if it had been in gang... Is there none whatsoever, Your Honor? There is not a shred of evidence to say this is an MS-13 bar or anything like that. I think if it had been, you go, there's a Second Circuit case, it's called maybe Versace or something like that, where someone says this is Gambino territory, this is a Gambino bar and someone drinks spilt on them. You don't mess with us in our bar. And they come back and kill the guy over the spilt drink. But there is not a shred of evidence in the record that suggests this is an MS-13 establishment. If it had been and he confronts someone over not paying their tab, then I think you've got a much stronger case for this being gang-related violence. Why isn't Barry L's phone call to Maradiaga enough to connect the two? Your Honor, first, I'll say that as far as that phone call goes, there's no evidence that the other individual who made the phone call was a gang member. It's also not a phone call where someone's bragging about this. They're telling him... Do you know that? I mean, it would seem to me at least inferable that they discussed, the jury could infer that they discussed the incident. I think they did discuss the incident in the phone call. I think he says you need to get out of town. So I will concede that point. But there's no evidence and I think it would be an impermissible inference to say that he's somehow saying he should get some sort of credit within the gang because there's simply no evidence from Mr. Madrigada's testimony that there had been any bragging related to the gang or anything along those lines. And as I said before, I think he actually said during that phone call that Mr. Sosa denied that he had been involved and he blamed it on Mr. Madrigada. And Your Honor, I see my time's up. I don't want to take away from my other co-counsel's time here, but if you have any questions, further questions for me, I'm happy to address them. Thank you very much. Ms. Coster? Good morning. May it please the Court. I represented Mr. Zelaya both at trial and on appeal. On appeal, I raised one issue and that was the denial of the Rule 29 motion that was made at the close of all of the evidence. I briefed that issue and made my arguments on brief. And at this point, unless the Court has any questions, I would stand on that brief but would be glad to answer any questions that the Court has this morning. All right. Thank you. Thank you. Mr. Parramore? Good morning. May it please the Court. I'm Wally Parramore from Jacksonville, North Carolina, Southeastern North Carolina. I was appointed for the appeal for Mr. Ordos Vega to please the Court. I'd like to speak very briefly and very specifically about the purpose, provision of 1959 and the Vicar Statute and make just a couple of points and reserve argument for counsel. You can view this case to please the Court as if it was an act in light most favorable to my client independent of MS-13. There's nothing in the case, nothing in the case record, which shows that he did this to enter a gang. According to all the evidence, he'd been a member of the gang since at least 2002. The date of offense here is in roughly 2015. There's no evidence that he did this, if these allegations are true, to maintain any position in the gang and to increase his position in the gang. It appears to me that anybody else that was present was merely present and if the allegations are true, he acted independently with respect to anything in this case. I bring that to the Court's attention because it goes directly to count four and to count five, which are bottomed together in the indictment that was prepared by the government. So I'd ask the Court to be aware of that argument and understand that argument with respect to my client. Also, judges raised some issues about 404B and made reference to a Second Circuit case, which I believe has a better standard and more protective standard to keep jurors from being distracted and watering down beyond a reasonable doubt in a criminal case with respect to confusion of issues. I'd ask the Court to be aware of that as well. The 404B issue is normally for the discretion of the district judge. It's a discretion standard. What stands out as a flag is this is 2015 and they're using law enforcement officers in the state of New York that supposedly had contact with Ordez Vega in 2002-2004. That's a remoteness issue that goes to the reliability and a distraction issue for a jury. And I would ask the Court to be aware of that in reviewing this case. Otherwise, Judge, we would stand on the brief as submitted to the Court and thank the Court for its time. Thank you, sir. Mr. Michael. Good morning. May it please the Court, my name is Aaron Michael. I'm the attorney for Mr. Gavidia. He raises issues with regard to the nature of the trial, the denial of his motion of severance from the co-defendants, and the prejudicial facts in the case that require a new trial. Issues raised before trial as far as the severance issue, but also during trial on a number of occasions that are marked in the briefs and in the record where he raises prejudicial issue about Your client wanted to be tried by himself? Yes, Your Honor. He didn't want a partial severance. He wanted a complete severance. Well, the choice of who to try him with was highly prejudicial. And there was no suggestion by the government to move his case to another case where they didn't have three people accused of killing people. I mean, my guys, anyone who's accused of actually shooting a gun at somebody, I mean, they claim that somebody else shot somebody and that he's responsible for it because he got into a bar fight and that at the end of the bar fight they were leaving, somebody throws a beer can at the car that my client's in, and these guys in the car behind them shoot the guy who's throwing the beer can. But that's different from the other three cases. And all three of the co-defendants make good cases for what happened in their case was not gang-related, a term that's being thrown around in this case in a very prejudicial way. But if you look at each of these cases, Mr. Zalela's case, Mr. Vega's case, Mr. I'm drawing a blank, the other case, they make a good case in the brief that there's a lack of evidence showing that it's gang-related. But they are accused, and I understand one recanted his admission of being involved and gave a reasonable explanation for why it wasn't him, it was somebody else that he identified, that they actually are accused of pulling the trigger on people. And that's an issue that inflames the passions of people in a way that what they were saying about Mr. Govidia would not. And for that reason alone, I would think that Mr. Govidia would need a separate trial to get a fair trial. And then you have just the nature of these gang prosecutions. But I think that the evidence will support what we're saying, Your Honor, that there's abuse of discretion that was unreasonable. And when something is unreasonable, it is an abuse of discretion, Your Honor. And with regard to the nature of the testimony, the best rebuttal of how they characterize the gang, compare that with what the evidence was about these people. The murders themselves, there was little to no evidence that it was gang-related. For example, in one case, it was evidence that wasn't related to a gang. It was just somebody acting in self-defense. This guy who was suspected of selling marijuana and had a gun reached down and, yes, ma'am? Who are you talking about now? I think that's Mr. Vega, who's accused of shooting somebody, and he raised the self-defense defense. I think he was with two other people that the government argued were gang members, and they talked about this guy and shared information about how he's got marijuana, a gun. And this is relevant to Mr. Govidia in what way? In that the government's starting with this definition of a gang and describing that the gang in terms of here's what you're dealing with, in terms of how they behave, and even the evidence in this case is inconsistent with that. You don't have the type of activity, concerted action, that you see in the case law. And a number of those cases are cited in the briefs. And Mr. Heroi talked about some of those cases, and they're very clearly involving people that are a business, are in a business to typically deal drugs, and you don't have that in this case. The evidence in the trial in this case did not establish that. All they established was that on one occasion, I believe, my client stated in his statement to the police that he was aware of somebody. He was present when somebody was taxed. Somebody was what? Taxed. That somebody taxed this drug dealer of I think it was like $100, something like that. And I would submit that that's not the type of businesses that we see in the case law that would rise to where RICO is supposed to take us. And that was the point I was trying to make, Your Honor, is that in terms of rebutting the government's key point is that the definition of the gang, it doesn't fit the facts of this case. And their own expert witnesses, including Mr. Arnold, as well as the officers White and Hastings, basically described what is a melting pot of different people from Central America, from different countries, who are a melting pot of people who get in fights with each other. Those are their words. And I think Mr. Arnold described one reason why they associate, which was self-defense, which is a valid reason to associate. And we associate for a very, we can't live without associating with other people to meet our basic fundamental needs. And even the words MS-13 and SIR-13, one expert said that they're interchangeable, that what's used in Charlotte might be different from what he sees used in Los Angeles. And so even their own expert witnesses provide testimony to suggest that we are dealing with Central American culture, Central American people, that there is no testimony specifically about any particular tattoos about my client. And I would submit about any of the other artwork involved that was specifically talking of artwork in anything other than a cultural Central American way. I mean, it's not like IBM logo is used in a certain way. There's no such thing in terms of what, you know, the testimony about what was used in this gang. It was just a broad brush of graffiti at two schools that was written. Do you think the government misunderstood all this? I think it's a narrative to support their war on gangs. I think that they have the budget to fight gangs. I think this is their effort to fulfill that purpose, Your Honor. And I would submit that when you allow for gang testimony unrestricted, unregulated by the trial court, that you're bound to have prejudice against the people whose liberties are at stake. And there is no effort in this case to control the gang testimony. I see my time's up. If there's no questions, I'll step down. Thank you. We appreciate it, sir. Thank you. Mr. Miller. Good morning. Good to have you here. Thank you. I'm representing the United States in this case, and may it please the court. The defendants received the fair trial to which they were entitled. There was ample evidence to support the jury's verdict, and we'll ask this court to affirm that verdict. Can I ask a specific question about Mr. Sosa? What is the government's argument with respect to Mr. Sosa's assertion that the activity with which he was charged was just an instance of personal venom or personal revenge rather than having a gang relationship? Can you speak to how the government would contend that the purpose element is met with respect to Mr. Sosa? Yes, Judge Duncan. And, again, the standard here is, you know, it doesn't have to be the sole purpose or even the primary purpose as long as it was a substantial purpose. And the question is really, was there enough for this to become a jury question? And there are several factors that I would cite that suggest that the district court properly let this become a factual question for the jury instead of taking it away from the jury. First, the shooting, it was in response to Mr. Sosa getting pushed around. There was plenty of evidence that gang members like Mr. Sosa could not abide those types of affronts in a public place, like a bar where this took place. And so when he initially backed down, that was showing weakness on his part in a public place, which there was ample evidence from other gang members and from gang experts that that type of weakness was against the gang, would hurt his reputation, and that responding to these types of affront was what was expected of him as a gang member. And so the first part is sort of the nature of the altercation initially with him getting backed down in a public place. Well, he was just going to get a better weapon. Right, and I think that goes to the second part, Your Honor, is the extreme response here. I mean, we've all seen sort of the bar fight scenario where people get pushed around, maybe a punch is thrown. But how is that in furtherance of gang activity? It's in furtherance of gang activity because it's what's expected of him as a gang member. He initially backs down. He gets pushed around by this guy. He can't let it lie that way. He goes home, gets an assault rifle, lies in wait for this victim and his buddy to leave the bar, then follows him throughout the streets of Charlotte and fires into his car. The testimony showed nearly a dozen times between Mr. Sosa and his cousin. That extreme violence goes way beyond a bar fight, and I think the jury could properly infer that that extreme, largely otherwise inexplicable violence was emblematic of the type of violence that's expected from MS-13 gang members. And so I do think that what takes this out of some of the cases that Mr. Heroy cited is this is not a spontaneous reaction. He went back, got his gun, followed the guy through the streets, and then lit up his car with an assault rifle. So where do we draw the line? Is any act of violence by a gang member in furtherance of the gang activity? Any act? No, Your Honor. Where do we draw the line so the government doesn't go so far? I think that what the cases show that Mr. Heroy cited is that purely private acts of violence, spontaneous acts of violence, acts of violence when there's clearly another motive like the Thai case where the guy got paid $10,000 for the crime and there was no evidence that he did it as part of a gang, those are the types of cases where courts have said, you know what, this is not enough to go to the jury. Here, there is no other explanation for that extreme level of violence other than his membership in the gang and the fact that he has to represent for the gang and couldn't let this affront in a public place just lie like that. And so I think that this court's case in Tipton is also instructive. And in that case, what the court found was there was a purely private motivation of revenge, but that because the jury could also fairly conclude that responding to these types of acts of disrespect with extreme violence was part of what the gang expected, that that became a jury question. In Tipton, though, his compadre was a gang member, whereas in Sosa, he wasn't a gang member. And I'm glad you brought that up, Judge Floyd, and it goes back to your question, Judge Duncan, about the call from the Cholito or Rodriguez Villarreal. I think what Mr. Haroy has said in his brief in here today is that there's no evidence that this Cholito character was in the gang, and I think that's not what the record shows. He wasn't a gang? Yes, Your Honor, and there were two – There was evidence of that fact. Yes, Your Honor, and I can point the court to it. There were two cooperators, Jose Vasquez and Aragon Hernandez, who both said they had seen Sosa and Cholito. By cooperators, you mean witnesses? Cooperating defendants, yes, Your Honor, who testified at trial. Yeah. And what Vasquez said is that he had seen Cholito and Sosa together. He also said Cholito was present at Sosa's jump-in. That's at 525 of the joint appendix. Aragon Hernandez said he saw Sosa and Cholito together. That was 839 of the joint appendix. And then Detective Tim White, who was one of the case agents and a gang detective, said he had seen Cholito and Sosa together while he was doing this sort of focused surveillance of them as they left a gang, and he ID'd a picture of Cholito, and it was the same picture that was shown to Maradiaga to sort of link that up. And so there was evidence throughout the trial that the guy who called Maradiaga afterward was part of the gang, and I think the inference that the jury could conclude from that call, and essentially what Cholito told Sosa's cousin in that call is, he's blamed you, you need to skip town. And I think the jury could fairly infer that that's part of the cover-up at this point, that his fellow gang member is coming to his aid and helping him try to get the witness out of town. And so I think that's a fair conclusion. It also at least shows that, you know, gang members learned of this incident, and so it did become public to other gang members. So I think that just to sum that up, the factors are it occurred in a public place. Sosa couldn't look weak and let the affront lie. That's consistent with other cases, including the Tipton case from this court. There was an expectation that gang members engage in this type of retaliatory violence. It wasn't a spontaneous response, and the nature of the extreme, otherwise inexplicable violence in response to what was initially just sort of pushing and shoving at a bar fight, as well as the fellow gang member seeking to help Sosa. All of that at least makes this a case where the jury could infer that this was a gang purpose, which is really the question for the court. Does this go to the jury? And I think the district court who also said, look, the district court judge did say, look, I don't think every act of violence committed by a gang member is a vicar. But in looking at that evidence, he did find that there was enough here to send it to the jury, and I think he got that right. How long was his trial there? The trial was five days, and deliberations lasted a couple of other days into the next week, if I recall correctly. Judge Conrad runs a very efficient courtroom. Moving to Ordonez Vega, who was another defendant who challenged the purpose element, this was the shooting by the Yellow Rose Bar. Or excuse me, this was the shooting by the Taco Bar, which was gang territory, as established by several witnesses. And there the facts show that Ordonez Vega was hanging out with several other MS-13 gang members. They see the victim roll up. He catches their attention based on the way he's dressed. He's wearing the wrong colors. He has the wrong haircut. He rides his bike around one of the gang members' trucks. They view that as potentially disrespectful and decide, based on the way he looks and the way he's acting, that they're going to set him up. They then lure him around back, at which point Ordonez Vega shot him five times. And so I think on those facts, that is classic MS-13 violence in gang territory, targeting a rival, and it's what's expected of them to sort of maintain their position and increase their status, as the testimony would establish. The third vicar is Mr. Zelaya. Is that the one where he said it wasn't gang territory? No, that was in response to Mr. Sosa. And I think to your question, Judge Floyd, there was not testimony establishing that that pushing and shoving bar fight was at a particular MS-13 bar. I do think it was in a public place. And so, you know, I would kind of draw the analogy to a prison yard. If an inmate who's in a gang gets pushed around in a prison yard and he just lets it go, that's going to affect badly on him, and it's not what's expected of him as a gang member. Were there any other gang members present in that bar? There's no evidence that there were, Your Honor. The other gang member came in, as to Judge Duncan's question, sort of after the fact to call the other witness and tell him to skip town. So to that point, the only gang member that there was evidence of was Sosa. And so sort of just to wrap that up with Zelaya, who's the third vicar defendant, the evidence there largely comes from Sosa's statement to law enforcement as well as his testimony. And the evidence of the purpose element for Mr. Zelaya, he believed that the victim's brother was established as a gang member through testimony. Zelaya at one point said he thought that the victim was a rival gang member as well. These two guys were brothers. The testimony showed that these brothers and perhaps a third brother had been looking for one of Zelaya's homies and had been going after them with guns. And so when Zelaya encountered this rival and this suspected rival in a parking lot, he shot one of them and killed him. And so I think there, that evidence of gang purposes was very strong. And then after the fact, there was testimony that Zelaya in prison told other gang members about this killing. And one of those gang members testified at trial that the reasons Zelaya had to come to him is because that's how you get status in the gang, and he was one of the older gang members. And so I think as to all three of those, Your Honors, there's plenty of evidence to let it go to the jury and have the jury conclude whether or not these arguments, you know, about whether it's just a public place, it's not gang territory, that's something that the jury could resolve at that point. There was at least enough there for them to infer that, hey, this extreme, otherwise inexplicable violence is explained by the fact that these guys are gang members, and it's what's expected of them. I'll turn to a couple of the other issues that defendants have raised, unless the Court has any other questions about the purpose element. With respect to the motion to sever at the outside of trial, I think that, again, as Judge King, as you pointed out, is an abuse of discretion standard. These defendants were properly joined. They were all part of the same conspiracy. There were several. You were indicted together? Yes, ma'am, they were indicted together. If you're indicted together, you're tried together. Yes, ma'am, especially in a conspiracy case like this one. I think the next question becomes, well, was there spillover prejudice that would require severance? And I think that what this Court's case law shows and what other cases have shown is that's better cured by an instruction than severing at trial. And although there was some confusion on day one that's been highlighted in the briefs, I believe one of the jurors asked for nameplates. By the time the trial progressed, every witness who had testified about one of these gang members ID'd him, said where he was sitting, and had him point him out. And so I don't believe that the risk of confusion was really an issue in this case. And the defendants who weren't charged with murder, Sosa and Govidia, who challenged the motion to sever, had both engaged in extreme violence as well. I mean, Sosa was charged with attempted murder. Govidia, the testimony showed, had participated in at least three shootings at bars. And so this is not a situation where you have defendants who are substantially less culpable than others, where it would be unfair to sweep them up with the remainder of the defendants. As to Ordonez Vega's argument about the testimony of the officers from New York, he says that was 404B evidence. We disagree. The testimony there that- It wasn't 404B evidence. No, Your Honor. Is part of the case? Yes, Your Honor. And the testimony that came in was two New York officers. One testified that he had seen Ordonez Vega's tattoos. Well, that was something that his attorney had admitted in opening statement. We had pictures of him from his arrest with those tattoos. And so that was established by other evidence, and is really not character evidence. The second officer testified that years prior to the conspiracy, Ordonez Vega had admitted to him in an encounter that he was a gang member. All of that evidence was relevant because the government had to prove that the defendant associated with MS-13 with knowledge of its purpose. And so here, this is not just, hey, he's a gang member, that's his character. This is an element that the government had to prove, and so therefore it was intrinsic to the case. And that's what cases have shown, is this testimony that he admitted he's a gang member is not to show some sort of prior bad act. It's to show that element that the government has to prove beyond a reasonable doubt. I would also suggest that there's no error there, but to the extent there was any error, the defendant testified, took the stand, denied that he had ever been a gang member, and at that point it was free game to sort of cross-examine and test that. And so that evidence would have been coming in anyway at that point. Let's see. There are several other issues raised. I mean, I guess as to Mr. Gavidia, the evidence that this was not an enterprise, I think that there was overwhelming evidence that this was an enterprise. This Court has found this to be an enterprise. To suggest that this is just Central American culture runs contrary to the evidence, and I think really misunderstands what MS-13 is about and the fact that it's really a plague on Central American culture, not emblematic of Central American culture. And so I do think there was plenty of evidence from which the jury could find that this was an enterprise. And as to Mr. Gavidia's membership in that enterprise, he admitted it to law enforcement when he was arrested. Every single one of the cooperating co-defendants who testified, all five of them, identified Mr. Gavidia. And there was plenty of evidence of his direct involvement in racketeering activity by selling drugs and by extorting other drug dealers in bars and things of that nature. And so I think as to him, there was ample evidence to support the jury's verdict. The defendants have raised other issues. I'm happy to address any questions that the Court may have about those issues. Otherwise, I would yield the balance of my time and thank the Court. Thank you. Appreciate it, Mr. Miller. Thank you very much. Let's see here now. Mr. Heroy. Thank you, Your Honor. May it please the Court, I have not spent the balance of Mr. Miller's time going back to the transcript. If I'm wrong, I'm wrong with regard to the individual referred to as Cholito. So perhaps there is evidence from which an inference could be gleaned. Again, I'm not conceding there is or there's not. But, again, I could be wrong there, and I would ask the Court that even if the Court That was my impression as well, but I would be happy to. I appreciate your candor, and I'd be happy to check that in the record as well. Thank you. Thank you, Your Honor. And if the Court is so inclined, I'm happy to supplement that as well. It's in the Okay. Well, it's in the record, I think. Yes, ma'am. Yes, Your Honor. Even if Cholito is a gang member, or there's at least an inference that he may be a gang member, that still doesn't elevate this to an act that's committed for the purpose of the gang. Cholito is also Madrigal's in-law. I think he's Madrigal's sister's husband. It was a little that there may have been some translation issues. It was tough to tell exactly their relationship. But there was some family, and he tells Madrigal, you need to get out of town, buddy. It's not the same as saying, heard you guys pulled off a good lick, great street cred to all of you, we give you some props or whatever. I'm sorry. I certainly do take your point. The government makes the point, though, which I think is fair, and that that is all we have to decide is whether it properly went to the jury, which is sort of a threshold, which is not quite the same as that's a very preliminary threshold kind of inquiry. Was there enough to put it to the jury to decide? Yes, Your Honor, and I agree we're up against a demanding standard here, but this is one of those cases where no reasonable or rational jury, whichever you decide to use, should have gotten this case. There is simply not a basis for permissible inference. We're just making impermissible assumptions to say this was committed for the gang purpose, that he's a bad dude and a gang member, so anything he does that's bad is an integral part of the gang. Even if it did involve a gang member at the end? Even if a gang member came in to help resolve the difficulty? I think even if a gang member helps someone escape town or tells them to get out of town, I don't think that elevates it to meet the question here, is whether or not it was committed for the purpose of advancing its rank within the gang. No, the question is whether or not there was enough evidence to take it to the jury to answer that question. And I would contend there's not, Your Honor, that there's still not enough for a reasonable jury to conclude that these actions were for that purpose, and it leaves us in a position where there's no principled basis for deciding what's gang violence and what's not. Thank you. Thank you. Thank all of you. Thank you very much, sir. Ms. Koster? Your Honor, no rebuttal. Thank you. Mr. Paramore? No, we have no rebuttal. Thank you. Thank you, Mr. Paramore. Mr. Michael? Thank you, Your Honor. The description by the government of the reasons to believe that, for example, Mr. Sosa's actions were gang-related boils down to mere association, mere presence. And I think that's kind of characteristic of this whole case. I mean, the mantra that if indicted together, tried together. You don't like that rule very well. Well, I don't see that rule in the rule book. I see Rule 8 and I see Rule 14. I think Rule 8 is the rule we go to to see if people should be tried together when they're indicted together. I mean, that's my understanding of the rule, is tried together, indicted together, tried together. It isn't really a rule. It's an observation of what often happens unless Rule 8 is applied to separate people. And if you look at the indictment in this case, there was nothing to connect Mr. Gavidia with anybody else. They're totally separate allegations in this long, lengthy, detailed, over-act-listing indictment. So they should not have been indicted together. There should not have been a mass indictment. There should not have been a mass trial. I understand how it fits the bureaucracy's need to be efficient. The indictment was defective in that respect. Pardon? The indictment was entirely defective in that respect. Put everybody in there? There's no rule saying we can get the indictment struck because there's too many people in the indictment, Your Honor. I wish there was. But you're saying there was a presidential jointer? Yes, Your Honor. Of defendants and counts or just defendants? Defendants most definitely because I don't think you can. Does that apply just to your client or does it also apply to some of the other defendants? Well, I can't speak for the other people. But you're the only one I've got left here to ask that to. You raised it. And could you restate the question, Your Honor? It definitely applies to your client as far as you're concerned. And this is the question of whether or not the defendants are properly joined? I was just asking if you were claiming that the presidential jointer as to defendants and counts or just as to defendants? I think at least in this particular case, given the allegations against the other three, that I don't think that you could separate them out. So I would say misjoinder of the defendants, Your Honor, because of the nature of the allegations. And if you look at the facts of this case as to what they're saying about the other three, I'm going back to this lack of evidence about showing that it was gang-related. I mean, each one of these people, the evidence shows that it had nothing to do with a business. I see my time's up. Thank you, sir. I observe that each of the defendants' lawyers are court-appointed. And you are? Those three are. The other three are court-appointed, Your Honor. You're retained? Yes, Your Honor. Well, good for you. Thank you. But in any event, I want to particularly thank the court-appointed lawyers for their service to the court, to the district court, to the Court of Appeals. We really appreciate your work. We couldn't do ours without you doing yours. And we appreciate your service as well, Mr. Arroyo. Thank you very much. And we'll come down and re-counsel, and then we'll call the next case.
judges: Robert B. King, Allyson K. Duncan, Henry F. Floyd